**FILED:** October 16, 2002

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,

Respondent,

v.

KIPLAND PHILIP KINKEL,

Appellant.

20-98-09574; A108593

Appeal from Circuit Court, Lane County.

Jack Mattison, Judge.

Argued and submitted July 31, 2002.

Jesse Wm. Barton, Chief Deputy Public Defender, argued the cause for appellant. With him on the briefs were David E. Groom, Acting Executive Director, Office of Public Defense Services, and Deanna M. Horne, Certified Law Student.

Robert B. Rocklin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Phillip D. Chadsey and Scott E. Crawford filed the brief *amici curiae* for The National Alliance for the Mentally Ill and The National Alliance for the Mentally Ill-Oregon.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

Affirmed.

HASELTON, P. J.

Defendant was convicted of four counts of murder and 26 counts of attempted murder, arising from the murder of his parents and a subsequent shooting rampage at Thurston High School in Springfield in May 1998. On appeal, he challenges his cumulative sentences on those convictions, which impose a total incarceration period of 111 years and 8 months, as violating Article I, section 15, and Article I, section 16, of the Oregon Constitution. We affirm.

Defendant was 15 years old and a freshman at Thurston High School at the time he committed the crimes. On May 20, 1998, defendant was arrested at Thurston High School for possession of a handgun. He was released into his father's custody later that day. Shortly after defendant and his father returned to their home, defendant shot his father in the head with a rifle, killing him. After killing his father,

defendant spoke on the telephone with several friends and with a teacher in an apparently normal manner and did not reveal what he had done. When defendant's mother came home later that afternoon, defendant met her in the garage and shot her six times with a pistol, killing her.

The following morning, defendant went to Thurston High School armed with three semi-automatic weapons. As he went toward the cafeteria, he warned one of the students whom he encountered to stay out of the cafeteria. He then attempted to shoot another student, but his gun would not fire. He chambered another round of ammunition and shot that student in the head, killing him. He then shot and wounded two other students. Defendant entered the cafeteria and began shooting. He wounded almost two dozen students. He walked up to a student who was crawling under a table and shot him in the neck, killing him. He then tried to shoot another student in the head at point-blank range, but his weapon was empty. When defendant stopped to reload his weapon, several students attempted to subdue him. Defendant pulled out another firearm and wounded one of the students who was trying to subdue him. Defendant eventually was subdued, arrested, and transported to the police station. At the police station, defendant attempted to attack a detective with a knife he had concealed on his person, and again was subdued.

Defendant confessed to the crimes. A search of defendant's house revealed a large collection of knives and guns, various books and documents on making explosives, and numerous improvised explosive devices and ingredients for making explosive devices. Bomb squads spent several days at defendant's house removing highly dangerous materials that defendant had secreted throughout the house.

Ultimately, defendant was charged with four counts of aggravated murder and 26 counts of attempted aggravated murder. He pleaded guilty to four counts of murder and 25 counts of attempted murder, and pleaded no contest to the final count of attempted murder. Pursuant to a stipulated sentencing agreement, the trial court imposed four concurrent 25-year sentences for the four counts of murder. The agreement did not control the sentencing on the 26 counts of attempted murder. Under the agreement, defendant also explicitly waived "the defenses of mental disease or defect, extreme emotional disturbance, or diminished capacity."

Evidence presented at sentencing demonstrated that defendant had been fascinated by weapons and explosives for many years. He had made comments to other students about his ability to build bombs and his desire to shoot people and had expressed admiration for the Unabomber and for a school shooting in Jonesboro, Arkansas. He had suggested to classmates that he might bring a gun to school and start shooting people and that he might bomb the school during a pep rally. Handwritten notations by defendant confirmed his interest in weapons and explosives and also revealed defendant's fantasies of killing people. Those fantasies did not simply focus on individuals, but on killing large numbers of people indiscriminately. Defendant had been disciplined for numerous instances of acting out at school over the course of several years, including various acts of aggression against other students. He also had been disciplined for throwing rocks off a highway overpass onto cars and for shoplifting. He had received a limited amount of mental health treatment for depression in 1997, but that treatment had been discontinued before the 1997-98 school year.

After the crimes, defendant was evaluated by numerous medical experts. He reported that he had been hearing voices since he was 12 years old, including a voice that generally advocated violence against others, a second voice that criticized defendant and sometimes advised him to commit suicide, and a third that echoed the words of the other two. Defendant stated that the voice that advocated violence against others instructed him to commit the murders and attempted murders on May 20 and 21, and he felt he had no choice but to obey the voice. He thought that the voices might have come from a chip that the government had implanted into his head. He also expressed concern that the Walt Disney Company was taking over the country and felt that he needed to be prepared for an invasion by the Chinese. He

expressed fears that he was being spied on and concerns that his medications were poisoned. He tried on several occasions, secretively, to avoid taking his medications. The medical experts, for the most part, concluded that defendant suffers from paranoid schizophrenia or, possibly, a schizoaffective disorder that combines some of the essential features of schizophrenia and depression.

Evidence was adduced at sentencing that a significant number of defendant's blood relatives have suffered from a variety of mental illnesses, including mood disorders, schizoaffective disorders, and schizophrenia. Several had been institutionalized. Expert testimony indicated that the presence of mental illness in defendant's family could have been a contributing factor to his own mental illness.

The experts who evaluated defendant agreed that he exhibited psychotic symptoms that correlated with the features of paranoid schizophrenia. People who suffer from paranoid schizophrenia often maintain well in school, work, or social situations until delusions, often persecutory in nature, cause them to act out in violent ways. The experts also agreed that there is no cure for paranoid schizophrenia. There are medications, however, that can control symptoms such as hallucinations and delusions, at least to some degree. One psychologist, Dr. Orin Bolstad, who conducted extensive testing of defendant, opined that some of defendant's symptoms, including hearing voices, had diminished when defendant was given such medication. When asked about defendant's future dangerousness, Bolstad was unable to make a prediction. He did observe, however, that defendant's initial response to antipsychotic medication was positive, that defendant was intellectually capable, and that defendant had not presented a management problem while incarcerated, all of which he thought were good prognostic indicators.

When asked to comment on potential public safety issues if defendant were to be released from prison, Bolstad suggested that defendant might someday be able to be released into the community with safeguards, including requirements that he see a psychiatrist regularly, be tracked by use of a monitoring bracelet, attend support groups, and have his blood and urine monitored to determine whether he was receiving the appropriate amounts of medication. He also suggested that, were defendant to be released from prison after serving 25 years, there might be advances in antipsychotic medications by that time.

Dr. William Sack, a psychiatrist who examined defendant, concurred that defendant's crimes were the product of a psychotic process that had been building over a long period of time. He believed that defendant's mental illness was treatable, although not curable. Sack rendered an opinion that, if defendant were to receive 25 or 30 years of treatment from a psychiatrist with whom he built a trust relationship, and if defendant were to take medications that obliterated his symptoms, he would not be a danger to society so long as he was carefully monitored. He also felt that, over the next 25 years, medications for, as well as knowledge about, schizophrenia were likely to improve. Sack acknowledged that, if defendant's mental illness went untreated, defendant would remain a dangerous person.

A large number of defendant's victims, as well as their parents, also spoke at the sentencing hearing. They almost uniformly expressed intense fears of defendant being returned to society and urged that defendant be incarcerated for the remainder of his life for his crimes. Some of the victims expressed hatred of defendant. Others forgave him. Some believed that defendant suffered from mental illness. Others did not. Several explained, eloquently, why defendant's mental illness did not change their beliefs that he should remain incarcerated. One parent stated:

> "I believe you should believe your doctors. That you should follow their advice. That you should live in a structured environment, take medications, receive counseling.

> "Because of personal rights, the court is often not able to mandate behavior once an inmate is released from prison. And you have personally shown that you will lie to those whom you

most trust, such as your mother and your doctor, and tell them you are fine and don't require further treatment or medication. You have shown that even when free medical care and drug treatment is available, that you will decide for yourself whether you feel like taking it or not. And you have shown that even with doctors entrusted [with] your care by your own defense counsel, that you will tell them different things according to your own perception of the truth.

"And therefore, I believe that for your own personal well being and mental treatment, and for the safety and well being of my only child, our family, and this community, that you be remanded to prison for the rest of your life."

Another parent stated:

"I don't think he will ever be safe to put back in society. If medicine is the answer for him, I say he can have it in jail. But who is to say that he will take it, if let out?

"I don't think we can take that chance that he will be okay after twenty-five years, because a life is too precious to lose."

Another parent stated:

"We will accept that you do have a mental defect, as there's no totally sane person who would have acted in the manner you did. We even believe it might be possible for you to live a fairly normal life--in a structured environment, with medication and the care of the right doctor.

"What we don't believe is that all those things will ever be available outside of a prison setting. * * * I feel that it would be impossible to ensure that there were the safeguards in place to protect society from your possible actions."

The sentencing court's ultimate decision reflected concerns that were similar to those expressed by some of the victims:

"The impressive medical experts * * * generally agree that with extensive, long-term treatment, they would not expect him to be dangerous to others, but they also acknowledge that future dangerousness is difficult to predict.

"Untreated, or I suppose improperly or incompletely treated, he is and remains dangerous. And as required by Article I, section 15, my focus must be much broader than the possible reformation or rehabilitation of Mr. Kinkel.

"One of the last things Dr. Bolstad said was to the effect that there is no cure for Mr. Kinkel's condition, that he should never be released without appropriate medication and--I quote--'an awful lot of structure and appropriate support services arranged for him.'

"We cannot predict what advances medical science will make in the treatment of whatever mental illness he has. We cannot guarantee that he will receive the treatment these doctors believe is necessary while in prison. And Dr. Bolstad, who knows the system, was not optimistic in that regard. And we cannot guarantee that Mr. Kinkel would follow up as necessary were he released to a relatively uncontrolled environment."

The court imposed a sentence of 90 months on each of the counts of attempted murder, pursuant to ORS 137.707(4)(a)(C) (providing mandatory minimum sentence of 90 months for attempted murder). The court ordered that each of those sentences for attempted murder be served consecutively to the murder sentences, and partially consecutive to and partially concurrent with each other. Specifically, the court determined that 50 months of each attempted murder sentence should be served concurrently with the other sentences, and 40 months of each attempted murder sentence should be served consecutively to the other sentences. In short, defendant was ordered to serve consecutively three years and four months for each attempted murder, in addition to the 25 years he was required to serve for the four murders. Defendant's total sentence length was 86 years and eight months for the 26 attempted murders and 25 years for the four murders, for a total of 111 years and 8 months. Because defendant's sentences are mandatory minimum sentences under ORS 137.707, he is not eligible for any form of sentence reduction or modification.

Defense counsel objected to the sentences on numerous grounds, arguing in particular that they were cruel and unusual under Article I, section 16, of the Oregon Constitution and that the trial court had erred in placing more emphasis on protection of society than on reformation, in violation of Article I, section 15, of the Oregon Constitution.

On appeal, defendant reiterates those arguments. We turn first to his argument under Article I, section 15. Article I, section 15, provides:

> "Laws for the punishment of crime shall be founded on these principles: protection of society, personal responsibility, accountability for one's actions and reformation."

Before 1996, Article I, section 15, provided: "Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice." At sentencing, the court noted that the 1996 amendment to Article I, section 15, emphasized the protection of society. The court stated, "To me, [the 1996 amendment] was a clear statement that the protection of society in general was to be of more importance than the possible reformation or rehabilitation of any individual defendant." Defendant objected to the trial court's emphasis on protection of society and asserts on appeal that the sentencing court, in making defendant's mandatory minimum sentences partially consecutive to one another, placed too much emphasis on the protection of society. Defendant argues that the four principles embodied in Article I, section 15, must be accorded equal weight. Defendant also argues that he has taken personal responsibility for his crimes and has been held accountable for them, so those two principles of Article I, section 15, have been satisfied. He argues that the expert testimony presented at sentencing shows that he can be rehabilitated successfully. He concludes, based on these arguments, that it would be unconstitutional under Article I, section 15, for him to be required to be incarcerated for the remainder of his life.

The state makes several responses to defendant's argument. First, the state posits that, by its terms, Article I, section 15, of the Oregon Constitution provides a basis for challenging the constitutionality of "[l]aws for the punishment of crime," not for challenging the length of a particular individual's sentences. Thus, the state argues, defendant could make a facial challenge to the validity of the sentencing laws under which he was sentenced, but may not challenge the cumulative length of his various sentences under Article I, section 15, while conceding that the laws under which he was sentenced were not, themselves, unconstitutional. It is true that we have, in the past, called into question whether the former version of Article I, section 15, could be used to challenge individual sentences, as opposed to the sentencing scheme itself. *See, e.g., State v. Rhodes*, 149 Or App 118, 122, 941 P2d 1072 (1997), *rev den*, 326 Or 390 (1998) (questioning whether Article I, section 15, can provide the basis for an "as-applied" challenge to a sentence); *see also State ex rel Huddleston v. Sawyer*, 324 Or 597, 613, 932 P2d 1145, *cert den*, 522 US 994 (1997) (prior case law does not suggest "that the choice of a

sentence must differ from criminal to criminal because of Article I, section 15"). We need not resolve the question here of whether an "as-applied" challenge is possible under Article I, section 15, because, even assuming that it is, defendant's total sentences would not violate that constitutional provision.

We assume, for the sake of argument only, that defendant can mount an Article I, section 15, "as-applied" challenge, not to the sentencing scheme under which he was sentenced, but to the total length of all of his sentences. We also accept for purposes of argument defendant's premise that the "personal responsibility" and "accountability" aspects of Article I, section 15, have been satisfied by his confession and his explanation that he committed the crimes in question because he felt he had no choice given that the voices in his head instructed him to do so.[1] With those assumptions, defendant's fundamental position here reduces to the proposition that, given defendant's potential for "reformation," the "protection of society" aspect of Article I, section 15, cannot and does not warrant the sentence imposed. We disagree.

The four criteria listed in Article I, section 15--protection of society, personal responsibility, accountability, and reformation--are not a mathematical formula to be applied by according each criterion only 25 percent of the weight to which it otherwise might be entitled were it not for the existence of the other three criteria. To the extent that the four criteria can be applied on the level of individualized sentencing, their particular significance must vary depending on the circumstances of the crime or crimes being sentenced. If, for example, a defendant were convicted of disorderly conduct for obstructing pedestrian traffic while intoxicated, ORS 166.025, and that defendant, at sentencing, offered evidence to the court that she had no criminal history and had undergone significant treatment for alcohol abuse since the crime, the court might well determine that the defendant had accepted personal responsibility for the crime, was well on her way to rehabilitation or "reformation," and that "protection of society" is of relatively less concern in determining the proper sentence to impose. On the other hand, if a remorseless defendant proudly accepts "personal responsibility" for her crime at sentencing and vows to repeat it, the sentencing court properly may, under such circumstances, accord *greater* weight to the need for protection of society in determining the sentence for that defendant. Finally, and of most obvious significance here, where the underlying crimes are extremely violent and involve multiple victims in a public setting, it may well be appropriate to accord the "protection of society" consideration greater weight.

In short, there is no simple mathematical formula for sentencing to be derived from the provisions of Article I, section 15. That there is a possibility that a defendant who has been convicted of four counts of murder and 26 counts of attempted murder may be "reformed" at some point in the distant future (meaning, as pertinent here, that he may not hear and obey voices in his head instructing him to kill people) does not mean that protection of society cannot properly be the paramount concern when the court sentences that defendant. Both the circumstances of defendant's crimes and the apparently incurable nature of his mental illness amply demonstrate that protection of society from this defendant is of vital concern. Moreover, the secretive nature of defendant's preparation for the crimes, his apparently random selection of most of his victims, and the irrational nature of paranoid schizophrenia all make it difficult, if not impossible, to predict whether defendant ever can be safely returned to society. The trial court did not err in determining that protection of society was a highly significant concern when sentencing this defendant.

We interpret Article I, section 15, based on its text and context and, to the extent necessary, the history of the constitutional provision. *See Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000) (explaining methodology, and cautioning courts against ending analysis without considering history of provision). As discussed above, nothing in the specific wording of the provision precludes giving the protection of society greater weight than reformation under certain circumstances. In addition, although

there is no case law surrounding the present version of Article I, section 15, our conclusion is in accord with the Oregon Supreme Court's interpretation of the earlier version of Article I, section 15. In *Tuel v. Gladden*, 234 Or 1, 6, 379 P2d 553 (1963), the court noted that the then-current version of Article I, section 15--which referred only to "reformation"--did not mean that protection of society was not to be considered:

> "The drafters of the constitution, however, did not include the most important [sentencing] consideration of all, *the protection and safety of the people of the state*. Such a principle does not have to be expressed in the constitution as it is the reason for criminal law. All jurisdictions recognize its overriding importance.

> "We interpret Art. I, § 15, of the Oregon Bill of Rights to command and require that Oregon sentencing laws have as their object reformation and not retaliation, but *they do not require that reformation be sought at substantial risk to the people of the state*."

(Emphasis added; footnote omitted.) *See also State v. Lippert*, 53 Or App 358, 362, 632 P2d 28, *rev den*, 291 Or 893 (1981) (incarceration without the possibility of parole for a specified term was constitutional under prior version of Article I, section 15, because the obligation to protect society overrides considerations of reformation when the criminal character of the individual demonstrates reformation is unlikely). Thus, before the enactment of the present version of Article I, section 15, the courts made it clear that protection of society could, in fact, be a more significant consideration in sentencing than reformation.

Defendant's argument in the present case rests on an implicit assertion that the current version of Article I, section 15, was intended to *weaken* the importance that properly can be placed on protection of society. A review of the historical circumstances that surrounded the enactment of the current version of Article I, section 15, reveals that that was not the case. *See Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559-60 n 8, 871 P2d 106 (1994) (history of initiated constitutional amendment includes ballot title and arguments for and against the measure included in the voter's pamphlet). This constitutional amendment was referred by the legislature to the voters in November 1996 as Measure 26. The legislative argument in support of the amendment argued that "reformation" should not be the sole principle on which criminal laws were founded. It argued: "You have the opportunity to vote for *the protection of your families and your neighbors.* * * * We ask that you help make Oregon *a safer place for all*." Official Voters' Pamphlet, General Election, Nov 5, 1996, 5 (emphasis added). Then-Attorney General Ted Kulongoski also provided statements in support of the amendment. He observed that "reformation alone is not enough to combat crime in Oregon." He stated, "One of the problems the public has is that they do not think that the system is fair and balanced, *for the protection of society*, for the victim, for you and me." Voters' Pamphlet at 6 (emphasis added). Speaker of the House Bev Clarno also provided an argument in support of the amendment. She noted that Article I, section 15, made reference only to reformation and that "our criminal justice system should reflect other priorities--priorities such as *protecting citizens of this state* and holding criminals responsible and accountable for their actions." Voters' Pamphlet at 7 (emphasis added). She went on to declare that "[w]e have a system that in many ways focuses on helping criminals and not on *protecting our neighborhoods and our families*." *Id.* (emphasis added).

The statements in support of the amendment were uniform in reflecting a belief that this amendment would *strengthen*, not weaken, the importance of "protection of society" as a sentencing consideration. Not even a statement in opposition to the measure suggested otherwise. We would do a grave disservice to the legislators who referred the measure, and the voters who enacted it, were we to interpret it to mean that "protection of society" was somehow to be given less weight under the new version of Article I, section 15, than under the prior version.

In this case, the court was charged with the task of sentencing defendant on 4 counts of murder and 26 counts of attempted murder. In sheer magnitude, those crimes are among the most horrific in Oregon's history. Given the circumstances of the crimes, it cannot be surprising that the sentencing court would conclude that protection of society from this defendant was of utmost importance. The trial court's imposition of sentences totaling 111 years and 8 months for defendant's crimes did not violate Article I, section 15, of the Oregon Constitution.

Defendant also makes a rather cursory argument that his sentences, when viewed together, violate Article I, section 16, of the Oregon Constitution, which provides: "Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." Defendant notes that the test under Article I, section 16, is whether a sentence is so disproportionate to the offense "as to shock the moral sense of all reasonable [persons] as to what is right and proper." *State ex rel Caleb v. Beesley*, 326 Or 83, 94-95, 949 P2d 724 (1997). He argues that he committed the crimes because of his mental illness, that his mental illness was not his fault, and therefore that the combined sentences for his crimes "shock the conscience." Defendant cites no authority for his assertion.

We understand defendant to be arguing that the combined, partially consecutive, mandatory minimum sentences for the 30 offenses he committed are disproportionate to the offenses; he does not seem to be asserting that any of the mandatory minimum sentences for murder or attempted murder is, in isolation, disproportionate to any of the crimes. Indeed, the Oregon Supreme Court has upheld a sentence of life imprisonment without the possibility of parole against an Article I, section 16, challenge where the crime in question was much less serious than those at issue here. In *Tuel*, the court upheld a "habitual offender" life sentence without the possibility of parole where the underlying offense was *burglary*. *Tuel*, 234 Or at 1-2. If a single sentence of life imprisonment without the possibility of parole such as the one in *Tuel* did not shock the court's conscience, we cannot say that 30 sentences--each for the serious crime of murder or attempted murder--which happen cumulatively to span a greater length than the defendant's life expectancy, shock the conscience.

Affirmed.

---

1. We recognize that that proposition certainly is debatable.

Return to previous location.

---


