UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KIPLAND KINKEL,                                        Case No. 6:11-cv-06244-AA

          Petitioner,                          OPINION AND ORDER

     v.

GERALD LONG, Superintendent,
Oregon State Correctional Institution,

          Respondent.

_____

AIKEN, District Judge.

      On May 20, 1998, petitioner Kipland ("Kip") Kinkel, a fifteen-year-old high school student, shot and killed his parents at their home in Springfield, Oregon. The next morning, Kinkel armed himself with several semi-automatic firearms and drove to his high school. There, Kinkel opened fire in a hallway and the cafeteria, killing two students, wounding another twenty-four. He also attempted to shoot a twenty-fifth student, but the clip in his gun was empty. After he was apprehended and taken into custody, Kinkel attempted to stab a police officer with a knife. Kinkel

ultimately pled guilty to four counts of Murder and twenty-six counts of Attempted Murder, and he was sentenced to almost 112 years of imprisonment.

Kinkel now seeks federal habeas relief pursuant to 28 U.S.C. § 2254. Kinkel contends that he was convicted in violation of the Sixth and Fourteenth Amendments, because his trial counsel failed to ensure he was competent to plead guilty and his severe mental illness prevented him from entering knowing and voluntary pleas. Kinkel also claims that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment, because he received a de facto life sentence for offenses he committed as a mentally ill juvenile. Finally, Kinkel asserts that the Oregon courts violated his due process rights by applying an incorrect standard of review and denying him the opportunity to be heard during his post-conviction proceedings.

Kinkel fails to meet the heavy burden of showing entitlement to federal habeas relief, and his First Amended Petition is denied.

<u>BACKGROUND</u>

The facts underlying Kinkel's convictions are not in dispute.

[Kinkel] was 15 years old and a freshman at Thurston High School at the time he committed the crimes. On May 20, 1998, [Kinkel] was arrested at Thurston High School for possession of a handgun. He was released into his father's custody later that day. Shortly after [Kinkel] and his father returned to their home, [Kinkel] shot his father in the head with a rifle, killing him....When [Kinkel]'s mother came home later that afternoon, [Kinkel] met her in the garage and shot her six times with a pistol, killing her.

The following morning, [Kinkel] went to Thurston High School armed with three semi-automatic weapons. As he went toward the cafeteria, he warned one of the students whom he encountered to stay out of the cafeteria. He then attempted to shoot another student, but his gun would not fire. He chambered another round of ammunition and shot that student in the head, killing him. He then shot and wounded two other students. [Kinkel] entered the cafeteria and began shooting. He wounded almost two dozen students. He walked up to a student who was crawling under a table and shot him in the neck, killing him. He then tried to shoot another student in the head at point-blank range, but his weapon was empty. When [Kinkel] stopped to reload his weapon, several students attempted to subdue him. [Kinkel]

> pulled out another firearm and wounded one of the students who was trying to subdue him. [Kinkel] eventually was subdued, arrested, and transported to the police station. At the police station, [Kinkel] attempted to attack a detective with a knife he had concealed on his person, and again was subdued.
>
> [Kinkel] confessed to the crimes. A search of [Kinkel]'s house revealed a large collection of knives and guns, various books and documents on making explosives, and numerous improvised explosive devices and ingredients for making explosive devices. Bomb squads spent several days at [Kinkel]'s house removing highly dangerous materials that [Kinkel] had secreted throughout the house.

*State v. Kinkel*, 184 Or. App. 277, 279-80 (2002).

The State charged Kinkel with four counts of Aggravated Murder, twenty-six counts of Attempted Aggravated Murder, twenty-four counts of Assault With a Firearm in the First and Second Degrees, and four counts charging theft and weapons offenses. Resp't Ex. 102. Kinkel was appointed two defense attorneys and a guardian ad litem. Resp't Exs. 128, 144-45; *Kinkel v. Lawhead*, 240 Or. App. 403, 405-06 (2011).

Numerous medical and psychological experts evaluated Kinkel. He reported that "he had been hearing voices since he was 12 years old, including a voice that generally advocated violence against others," and the voice had "instructed him to commit the murders and attempted murders" and "he felt he had no choice but to obey the voice." *State v. Kinkel*, 184 Or. App. at 281. The experts generally agreed that Kinkel suffered from psychosis and some form of paranoid schizophrenia, or a "schizoaffective disorder that combines some of the essential features of schizophrenia and depression." *Id.*; *see* Transcript on Appeal (Tr.) Vol. III at 354-56, 373-76, 413-14; Tr. Vol. V at 672, 675-76, 678-79. Based on the recommendation of a child psychologist, Kinkel began taking antipsychotic medications. *Lawhead*, 240 Or. App. at 406.

In July 1999, Kinkel's attorneys instructed him to stop taking his medications to facilitate accurate psychological and neurological assessments of his mental condition. *Id.*; Resp't Exs. 120 at 4, 121 at 15-16, 141 (chart attachment); Tr. Vol. IV at 592. Kinkel's auditory hallucinations and

depression began to worsen "due to the withdrawal of the antipsychotic medications and the stress of the impending trial." *Lawhead*, 240 Or. App. at 406. On September 21, 1999, Kinkel resumed taking his medications. *Id.*

On September 23, 1999, the parties participated in a settlement conference mediated by a state court judge. Although Kinkel was not present at the settlement conference, his attorneys and his appointed guardian ad litem conferred and communicated with him throughout the proceeding. *Id.*; Resp't Ex. 149 (Mullen Dep. at 24, 28-29).

Ultimately, Kinkel and the State reached an agreement under which the State would dismiss the Aggravated Murder and Attempted Aggravated Murder charges, along with the assault, theft, and weapons charges, and Kinkel would plead guilty to four counts of Murder and twenty-five counts of Attempted Murder and no contest to one count of Attempted Murder. *Lawhead*, 240 Or. App. at 407; Resp't Ex. 103 at 2-12. The plea agreement also provided that Kinkel would receive concurrent 25-year sentences for the four Murder counts and mandatory sentences of ninety months for each Attempted Murder count; whether the ninety-month sentences would run concurrently or consecutively was left "open" and within the discretion of the sentencing judge. Resp't Ex. 103 at 12-13; Or. Rev. Stat. § 137.707(4)(a)(D) (imposing a mandatory sentence of ninety months for Attempted Murder).

The sentencing hearing began on November 2, 1999 and continued for six days. *See generally* Tr. Vols. II-VII.

> Evidence presented at sentencing demonstrated that [Kinkel] had been fascinated by weapons and explosives for many years. He had made comments to other students about his ability to build bombs and his desire to shoot people and had expressed admiration for the Unabomber and for a school shooting in Jonesboro, Arkansas. He had suggested to classmates that he might bring a gun to school and start shooting people and that he might bomb the school during a pep rally. Handwritten notations by [Kinkel] confirmed his interest in weapons and explosives and also revealed [Kinkel]'s fantasies of killing people. Those fantasies

did not simply focus on individuals, but on killing large numbers of people indiscriminately.

*State v. Kinkel*, 184 Or. App. at 280; *see also* Resp't Ex. 154 (presentence investigation report filed under seal).

Several medical and psychological experts testified at sentencing. Dr. Richard Konkol, a pediatric neurologist, testified that Kinkel's examination revealed abnormalities in areas of language, "attentional abilities," motor skills, and sensory abilities. Tr. Vol. IV at 570-72. Dr. Konkol believed that Kinkel's neurological abnormalities suggested damage in the parietal, prefrontal, and temporal lobes of his brain, creating cognitive defects that could increase susceptibility to psychotic episodes. *Id.* at 572, 577, 581-82, 584-90, 592-93. Dr. Konkol believed that the prognosis for a juvenile with Kinkel's deficits was "hopeful" with "proper management" and medication. *Id.* at 596-97.

Dr. Orin Bolstad, a child psychologist who conducted extensive examinations and testing of Kinkel, testified that Kinkel's illness, while not curable, was treatable. Tr. Vol. III at 454, 486. Dr. Bolstad testified that Kinkel's symptoms, including his auditory hallucinations, diminished with antipsychotic medication and he believed Kinkel's illness could be managed with appropriate treatment. *Id.* at 350-52, 445, 448, 485-86. At the same time, Dr. Bolstad would not predict Kinkel's future dangerousness and added, "Real frankly, I would not want to see Kip Kinkel out on the streets, ever, with this condition, okay? Without medicine and without an awful lot of structure and support services arranged for him." *Id.* at 447, 486. Dr. Bolstad suggested certain safeguards if Kinkel was ever released from prison, including conditions that Kinkel see a psychiatrist, undergo blood testing and urinalysis to check his medication, attend support groups for mentally ill individuals, and wear a monitoring device. *Id.* at 451-52.

Dr. William Sack, a child and adolescent psychiatrist, also testified. Tr. Vol. V at 665. Like Dr. Bolstad, Dr. Sack opined that Kinkel's mental illness was treatable but not curable. *Id.* at 687. Dr. Sack believed Kinkel's prognosis had several "positive" indicators and Kinkel could be released into the community in twenty-five to thirty years if he took medications that controlled his symptoms and received consistent treatment from a psychiatrist he trusted. *Id.* at 688-90. Dr. Sack acknowledged that Kinkel would remain "dangerous" if his mental illness was not appropriately treated. *Id.* at 706-07. Drs. Bolstad and Sack both testified that improved medication and other advancements in treating schizophrenia would likely occur over the next twenty-five years. Tr. Vol. III at 452-54; Tr. Vol. V at 690-91, 708.

Eighteen of Kinkel's victims, all of whom had suffered serious if not life-threatening injuries, spoke or provided statements at the hearing. They described the extensive physical and psychological trauma they suffered as victims of and witnesses to a mass shooting at their school. Tr. Vol. VI at 796-803, 815-16, 819-21, 825, 828-35, 860-65, 873-75, 878-82, 895-99, 901-03, 906-07, 916-21, 924-25, 928-30. Many of the victims' parents, including the parents of the two children killed by Kinkel, also spoke and recounted the pain, anguish, and despair they and their children had experienced. Tr. Vol. V at 728-31; Tr. Vol. VI at 786-795, 804-15, 817-18, 821-24, 826-28, 835-59, 865-73, 875-77, 882-94, 899-901, 903-04, 907-16, 921-24, 930-35. All asked that Kinkel be sentenced to prison for the rest of his life.

During closing argument, Kinkel's counsel emphasized that Kinkel was "mentally ill," "neurologically impaired," and "a child who was only fifteen years old at the time of this conduct," and counsel urged the court to impose concurrent ninety-month sentences for the Attempted Murder convictions. Tr. Vol. VII at 1004. The State recommended the maximum potential sentence of 220 years, arguing that "[t]here are no guarantees this defendant will be okay. The

only way to protect our society is to keep him in custody. He's horrendously dangerous, and past acts are the best predictors of future behavior." Tr. Vol. VI at 961, 963.

On November 10, 1999, the court imposed sentence. The court began by reciting the Oregon Constitution and the provision requiring criminal penalties to be "proportional to the offense." Tr. Vol. VII at 1022. The court recounted two homicide cases involving a sixteen-year-old and a nineteen-year-old suffering from mental illness, noting that those defendants received sentences of twenty-five years and life with a minimum of thirty years, respectively. *Id.* at 1022-23. The court declared, "The facts of these two cases pale in the light of the facts in this case, and a sentence of 25 years or so in this case is not proportional to those sentences or to these present facts." *Id.* at 1023.

While the court acknowledged that Kinkel's medical experts were "impressive" and agreed, "with extensive, long-term treatment, they would not expect [Kinkel] to be dangerous to others," the court noted that Kinkel's "future dangerousness is difficult to predict" and "[u]ntreated," or "improperly or incompletely treated, he is and remains dangerous." *Id.* at 1023-24. Ultimately, the court found:

> We cannot predict what advances medical science will make in the treatment of whatever mental illness he has. We cannot guarantee that he will receive the treatment these doctors believe is necessary while in prison….And we cannot guarantee that Mr. Kinkel would follow up as necessary were he released to a relatively uncontrolled environment.

Tr. Vol. VII at 1024. The court further explained that even if it could impose a "long-range, conditional sentence," it would not do so because the victims' testimony had convinced the court that "this sentence needed to account for each of the wounded, who rightly call themselves survivors, and for Mr. Kinkel to know there was a price to be paid for each person hit by his bullets." *Id.* at 1025.

In accordance with the plea agreement, the court sentenced Kinkel to concurrent, twenty-five-year sentences for the four Murder convictions. The court also sentenced Kinkel to the presumptive ninety-month sentence for each Attempted Murder conviction, to be served consecutively to his twenty-five year sentence and partially consecutive to each other. *Id.* at 1025-26. "Specifically, the court determined that 50 months of each attempted murder sentence should be served concurrently with the other sentences, and 40 months of each attempted murder sentence should be served consecutively to the other sentences." *State v. Kinkel*, 184 Or. App. at 284-85. In total, the court imposed an aggregate sentence of 111 years and eight months. Because Kinkel's "sentences are mandatory minimum sentences under ORS 137.707, he is not eligible for any form of sentence reduction or modification" or release on parole. *Id.* at 285.

After an unsuccessful direct appeal challenging the length of his sentence, Kinkel sought post-conviction relief (PCR) in the Oregon courts. Resp't Exs. 104-14; *see also State v. Kinkel*, 184 Or. App. 277, *rev. denied,* 335 Or. 142 (2002). In his PCR petition, Kinkel claimed that his trial counsel provided ineffective assistance by failing to ensure he was competent to plead guilty, his appellate counsel was ineffective by failing to raise issues of competency on appeal, and the trial court erred by accepting Kinkel's guilty plea without ensuring he could enter a valid plea. Resp't Ex. 115. In support of his PCR claims, Kinkel proffered expert reports and testimony from Drs. Bolstad and Sack, who opined that Kinkel lacked the capacity to enter a voluntary plea in September 1999. *See* Resp't Exs. 118 (Ex. 3), 123; PCR Transcript of Proceedings (PCR Tr.) at 69, 71-72, 167-68. The PCR court denied these claims, the Oregon Court of Appeals affirmed in a written opinion, and the Oregon Supreme Court denied review. Resp't Exs. 187, 193-94, 198-201; *Lawhead*, 240 Or. App. 403, *rev. denied*, 350 Or. 408 (2011).

After exhausting his state court remedies, Kinkel filed this federal habeas action and asserted three grounds for relief: 1) the Oregon courts applied an incorrect standard of review when assessing Kinkel's PCR claims; 2) trial counsel was ineffective for failing to ensure Kinkel was competent at the time of his plea; and 3) Kinkel's plea was involuntary due to his mental illness. Pet. at 6, 9, 11 (ECF No. 1).

In 2010 and 2012, the Supreme Court of the United States held that the Eighth Amendment categorically prohibits sentences of life without parole for juvenile offenders convicted of non-homicide offenses, *Graham v. Florida,* 560 U.S. 48 (2010), and similarly bars mandatory sentences of life without parole for juvenile offenders convicted of homicide. *Miller v. Alabama*, 567 U.S. 460 (2012).

In January 2013, Kinkel requested a stay of this federal habeas action while he pursued a second PCR petition in the Oregon courts.

In Kinkel's second PCR proceeding, he claimed that his aggregate sentence was imposed in violation of *Miller* and *Graham* and prohibited by the Eighth Amendment. Resp't Exs. 202, 209, 211. The State moved for summary judgment on grounds that Kinkel's second PCR petition was "successive," untimely, and barred under Oregon law. Resp't Ex. 206. The PCR court agreed and granted the State's motion. Resp't Exs. 212-13. The Oregon Court of Appeals affirmed, finding that Kinkel had raised a similar Eighth Amendment challenge on direct appeal and could not raise it again in a PCR proceeding. *Kinkel v. Persson*, 276 Or. App. 427 (2016). The Oregon Supreme Court granted review and held that, regardless of any procedural bar, Kinkel's Eighth Amendment claims failed on the merits. *Kinkel v. Persson*, 363 Or. 1 (2018).

Soon afterward, the stay in this case was lifted and Kinkel filed a First Amended Petition asserting seven grounds for relief. Kinkel alleges the three grounds included in his original

Petition, two grounds challenging the constitutionality of his sentence under *Miller* and *Graham*, and two grounds alleging Eighth and Fourteenth Amendment violations arising from the Oregon Supreme Court's decision in *Kinkel v. Persson*. First Am. Pet. (ECF No. 90).

## DISCUSSION

This Court's review of Kinkel's First Amended Petition is governed by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Under the AEDPA, a federal court may not grant habeas relief regarding any claim "adjudicated on the merits" in state court, unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1),(2).

A state court decision is "contrary to" clearly established federal law if it fails to apply the correct Supreme Court authority or reaches "a different result" in a case with facts "materially indistinguishable" from relevant Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly established federal law if it identifies the correct legal principle but applies it in an "objectively unreasonable" manner. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *Williams,* 529 U.S. at 407-08, 413. Likewise, a state court ruling rests on an "unreasonable determination of the facts" if the court's finding of fact is "*objectively* unreasonable." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). The state court decision "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v.*

*Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citation omitted). Thus, "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson*, 532 U.S. 782, 793 (2001). To meet this highly deferential standard, a petitioner must demonstrate that "the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The AEDPA standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A.  Ground One:  Incorrect Standard of Review

In Ground One, Kinkel contends that the Oregon Court of Appeals violated his due process rights by applying the wrong standard of review during his first PCR appeal. Kinkel argues that the Oregon Court of Appeals incorrectly found the "determinative question" to be "whether there is *any* evidence in the record" to support the PCR court's decision, *Lawhead*, 240 Or. App. at 413, when the correct legal standard is whether the PCR court's findings are "supported by the evidence." First Am. Pet. at 14 (citing Or. Rev. Stat. § 138.650). Kinkel presents no argument to support Ground One and, for that reason alone, he fails to establish entitlement to habeas relief. Pet'r Brief at 81 (ECF No. 130); *Pinholster*, 563 U.S. at 181 (noting that the "petitioner carries the burden of proof"); *Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014) (stating that a habeas petitioner bears the "daunting" burden of proving claims).

Moreover, Ground One fails to assert a violation of Kinkel's federal constitutional rights. Ground One arises from a standard of review established by Oregon law, and it is well established that federal habeas relief is not available to remedy alleged errors of state law. *See* 28 U.S.C.

2254(a) (permitting habeas relief only on federal constitutional grounds); *Estelle v. McGuire,* 502 U.S. 62, 67 (1991). Kinkel fails to explain how the incorrect application of Oregon law violated his federal due process rights, and habeas relief is denied on Ground One.

    B.  <u>Ground Two:  Ineffective Assistance of Counsel</u>

In Ground Two, Kinkel claims that his counsel provided constitutionally ineffective assistance by failing to ensure he was competent to plead guilty. *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012) ("During plea negotiations defendants are entitled to the 'effective assistance of competent counsel.'"); *Strickland v. Washington*, 466 U.S. 668 (1984) (explaining the elements of an ineffective assistance of counsel claim). Kinkel maintains that his counsel knew his mental health had deteriorated after he ceased taking antipsychotic medications in July 1999 at their direction, and counsel nonetheless proceeded with a settlement conference and plea hearing without ensuring Kinkel was capable of making a rational decision.

The PCR court denied this claim, finding that "counsel simply had no indications whatsoever that petitioner was unable to aid and assist them and fully participate in the entry of his guilty pleas." Resp't Exs. 187 at 3, 193 at 7. The PCR court emphasized that no mental health professional had found Kinkel incompetent or unable to understand the proceedings, and the trial court and counsel would have been duty-bound to seek a competence inquiry had they suspected Kinkel was unfit to proceed. Resp't Exs. 187 at 2-3, 193 at 6-7. The Oregon Court of Appeals affirmed, finding sufficient evidence in the record to support the PCR court's findings. *Lawhead*, 240 Or. App. at 413-14.

As with Ground One, Kinkel presents no argument to support Ground Two and fails to explain how the Oregon courts' decisions were contrary to or an unreasonable application of *Lafler* or *Strickland*. Pet'r Brief at 81. Accordingly, habeas relief is denied on Ground Two.

C.  Ground Three:  Unknowing and Involuntary Guilty Pleas

In Ground Three, Kinkel contends that his guilty pleas were not knowing or voluntary in violation of his right to due process under the Fourteenth Amendment. Kinkel argues that his severe mental illness, the symptoms of which worsened after the cessation of his antipsychotic medication, left him incapable of making a reasoned choice to plead guilty and was the "coercive force invalidating his plea of guilty." Pet'r Brief at 39.

The PCR court rejected this claim. The PCR court found that "no evidence" indicated Kinkel "was incompetent to stand trial, unable to aid and assist in his own defense, unfit to proceed by reason of incapacity due to mental disease or defect, unable to understand the nature of the proceedings, unable to assist and cooperate with counsel, or unable to participate in his own defense." Resp't Exs. 187 at 3, 193 at 7. The PCR court further found that the evidence of record "totally" contradicted Dr. Bolstad's and Dr. Sack's "'theories' that petitioner 'might' have been mentally incompetent at the time of the plea." Resp't Ex. 187 at 3. Citing Kinkel's deposition testimony, the PCR court believed Kinkel's "problem with his plea was the fact that he thought he had a 'good chance' of receiving 40 to 50 years and instead received nearly 112." Resp't Ex. 193 at 7. The Oregon Court of Appeals affirmed, finding that the PCR court's findings were supported by sufficient evidence. *Lawhead*, 240 Or. App. at 414-15. Respondent contends that the Court of Appeals' affirmance is entitled to deference.

Kinkel argues that AEDPA deference does not apply, because the Oregon courts applied the legal standard for mental competency rather than the standard governing a knowing and voluntary plea. *See id.*; Resp't Ex. 193 at 8; *compare Hill v. Lockhart,* 474 U.S. 52, 56 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'")

with *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (to be competent, a defendant must be able "to consult" with counsel "with a reasonable degree of rational understanding" and have "a rational as well as factual understanding of the proceedings"). Kinkel thus argues that the Oregon courts either applied the incorrect Supreme Court authority or failed to reach the merits of his claim and their decisions are not entitled to deference. Pet'r Brief at 35-36. I disagree.

Before a defendant enters a guilty plea, the trial court must ensure that the defendant is competent and that the waiver of "constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400 (1993); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975). A competence inquiry focuses on the "defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings," *Godinez*, 509 U.S. at 401, n. 12, and to "make a reasoned choice among the alternatives presented." *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981). In contrast, the "knowing and voluntary" inquiry focuses on "whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez*, 509 U.S. at 401, n. 12 (citation omitted).

Typically, "[w]hether a defendant is competent to plead guilty and whether that defendant has actually entered a knowing and voluntary plea are different inquiries." *Hibbler*, 693 F.3d at 1150, n. 5. However, "a defendant who lacked the ability to understand the proceedings would also not be able to understand the consequences of decisions made during the proceedings." *Id.* Thus, if a petitioner alleges an unknowing and involuntary plea based solely on the *inability* to understand the plea process and make a reasoned decision, the questions of competency and voluntariness are one and the same.

Before the PCR court, Kinkel argued that he could not "aid and assist" in his defense or enter a knowing and voluntary guilty plea "because of his mental illness." PCR Tr. at 13-14; *see*

*also* Resp't Ex. 141 at 31 (PCR trial brief arguing that Kinkel "did not have the rational ability to choose" due to his mental illness). To support his claim, Kinkel called Drs. Bolstad and Sack to testify and opine whether Kinkel was "mentally competent" and had "the ability to make a rational choice between pleading guilty and going to trial." PCR Tr. at 69, 72; *see also id.* at 146 (PCR counsel asking, "Was Kip Kinkel mentally competent to make a decision on the plea agreement whether or not to plead guilty or go to trial?"); *id.* at 167 (asking similar question).

As reflected by this record, the entire premise of Kinkel's PCR claim rested on his alleged *inability* to enter a knowing and voluntary plea rather than any misunderstanding he had about the significance and consequences of his decision, and this argument necessarily implicated Kinkel's competence. *See Godinez*, 509 U.S. at 401, n. 12; *see also* Pet'r Brief at 35 (arguing that Kinkel "did not have the rational ability to choose whether to waive his rights or accept a guilty plea"). Accordingly, the issues of competence and voluntariness collapsed, and the PCR court and the Oregon Court of Appeals reasonably looked to standards governing competence.

Alternatively, Kinkel argues that AEDPA deference should not apply because the Oregon Court of Appeals' affirmance was based on "an unreasonable determination of the facts in light of the evidence presented." Pet'r Brief at 37; 28 U.S.C. § 2254(d)(2). Kinkel maintains that the Oregon courts ignored evidence that he had not taken his antipsychotic medication in the months immediately preceding the plea process, and his mental health had deteriorated and his auditory hallucinations had intensified as a result. *See, e.g.,* Resp't Exs. 120 at 4, 121, 125, 141 (chart attachment). Kinkel also relies on the opinions of Drs. Bolstad and Sack, who testified during the PCR proceeding that Kinkel's mental illness left him incapable of entering a knowing plea under the circumstances. Resp't Exs. 118 (Ex. 3), 123; PCR Tr. at 69, 71-72, 116, 146-47, 167-68, 194. Given this evidence, Kinkel argues that the PCR court unreasonably determined that his mental

illness did not affect his ability to plead guilty and the Oregon Court of Appeals unreasonably found sufficient evidence to support the PCR court's decision.

Without question, it is troubling that Kinkel had resumed his antipsychotic medication only two days before the settlement conference and was experiencing auditory hallucinations at the time of his plea. *See* Resp't 177 (Kinkel Dep.) at 67-69, 126-28. At the same time, the question before the PCR court was not whether Kinkel experienced symptoms of mental illness but whether those symptoms left him unable to understand the plea proceedings and the significance and consequences of his decision. *Deere v. Cullen*, 718 F.3d 1124, 1146-47 (9th Cir. 2013) (when assessing the voluntariness of a guilty plea, "what matters is not whether [the defendant] had a mental illness that affected his decision, but whether he had a mental illness that affected his capacity to understand his situation and make rational choices"); *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004) ("Evidence showing that a prisoner's decision is the product of a mental disease does not show that he lacks the capacity to make a rational choice.").

As noted by the PCR court and the Oregon Court of Appeals, Kinkel's attorneys and the trial court believed he was competent and able to understand the plea proceedings, and no mental health expert suggested otherwise. *See Lawhead*, 240 Or. App. at 413-15; Resp't Exs. 149, 150, 152, 187; *see also* Tr. Vol. III at 363-64 (Dr. Bolstad testifying at the sentencing hearing that he "didn't see anything rising to the level of inability to aid and assist"). During the plea hearing, the trial court reviewed each paragraph of the plea agreement and asked Kinkel "whether he understood the process by which the agreement was reached and the reasons for electing to accept the agreement rather than proceed to trial." *Lawhead*, 240 Or. App. at 407, 415; *see also* Tr. Vol. I at 4-34; Resp't Ex. 103 at 12-14. Kinkel gave no indication that he did not understand the proceedings or the consequences of the plea agreement.

16    - OPINION AND ORDER

Further, neither Dr. Bolstad nor Dr. Sack evaluated Kinkel for competency at the time of his plea, and the opinions that they provided to the PCR court were disputed by Dr. Eric Johnson, a psychological expert who conducted a forensic evaluation of Kinkel in August 1999. PCR Tr. at 62, 139, 154, 191, 239. Dr. Johnson found no evidence suggesting Kinkel was incompetent and viewed the opinions of Drs. Bolstad and Sack as "post hoc analysis" unsupported by reliable evidence. *Id.* at 241-46, 270, 274-76, 304.

Finally, as emphasized by the PCR court, Kinkel testified during his PCR deposition that he understood the plea process and "the reasons why he and his attorneys chose to go the 'plea route' rather than proceed to trial." Resp't Ex. 187 at 3; *see* Kinkel Dep. at 36, 46, 49, 51, 94, 99, 103, 122. In particular, Kinkel understood the plea agreement to mean he "would plead guilty" and "get anywhere between 25 years and 220 years," and his sentence "would be decided at a sentencing trial by the judge." Kinkel Dep. at 78; *see also id.* at 41-43. Kinkel also understood that "it was up to the judge to decide whether he could run the sentences all together...or stack them one after the other." *Id.* at 78, 135.

Kinkel agreed that he had rational reasons for pleading guilty – he did not "want to sit through the presentation of the evidence," he thought he "would lose at trial," and he "wanted a shot at getting a reduced sentence." *Id.* at 122; *see also id.* at 51. Kinkel also acknowledged that the auditory hallucinations he experienced did not prevent him from asking questions of his attorneys or understanding their advice. *Id.* at 26, 36, 48-49, 68, 104. In fact, Kinkel testified that he "probably" would have pled guilty regardless of the voices and regretted his decision to plead guilty primarily because of the lengthy sentence he received. Kinkel Dep. at 68-69, 94-95, 101-02, 123-24, 129. When asked whether he believed that he "voluntarily gave up" his right to trial and

whether he "knew the ramifications of that decision," Kinkel answered, "Yes." *Id.* at 122; *see also id.* at 80, 100.

In light of this record, the PCR court's finding that Kinkel knowingly and voluntarily pled guilty was not based on an unreasonable determination of the facts, and the Oregon Court of Appeals' affirmance is entitled to deference.

D.  Ground Four:  Unconstitutional Sentence in Violation of *Miller*

In Ground Four, Kinkel claims that the 112-year aggregate sentence for crimes he committed as a juvenile violates the Eighth Amendment's proscription against cruel and usual punishment, because the sentencing court did not consider his youth and related characteristics as mitigating factors before imposing a de facto life sentence with no possibility of release.

The Eighth Amendment's prohibition against cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In particular, the "concept of proportionality is central to the Eighth Amendment," that is, the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Graham*, 560 U.S. at 59 (citation omitted).

In the case of juvenile offenders, the Supreme Court has held that the Eighth Amendment categorically prohibits the imposition of certain punishments as excessive and disproportionate, because juveniles "have diminished culpability and greater prospects for reform and are 'less deserving of the most severe punishments.'" *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68). For example, juveniles who commit murder may not be sentenced to death, *Roper*, 543 U.S. at 568, and juveniles who commit non-homicide offenses may not be sentenced to life without "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 82.

In *Miller v. Alabama*, the Supreme Court reaffirmed that "youth matters" in sentencing and held that the "Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" convicted of homicide. *Miller*, 567 U.S. at 473, 479. The Supreme Court explained that, because mandatory sentencing schemes remove "youth from the balance" and "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it," such laws impermissibly prevent "a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474, 476.

Although the Supreme Court surmised that life imprisonment without parole should be reserved for the "rare juvenile offender whose crime reflects irreparable corruption" rather than "transient immaturity," it did not categorically forbid the imposition of such sentences. *Id.* at 479-80 (citations omitted). Rather, "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Montgomery v. Louisiana*, 577 U.S. 190, 209-10 (2016).[1] According to the Supreme Court, discretionary sentencing ensures that sentencers will give "individualized" consideration to juvenile offenders' "chronological age and [] hallmark features," as well as their "diminished culpability and heightened capacity for change," in order "to separate those juveniles who may be sentenced to life without parole from those who may not." *Jones v. Mississippi*, 141 S. Ct. 1307, 1313, 1316-18 (2021) (quoting *Miller*, 567 U.S. at 477, 479 and *Montgomery*, 577 U.S. at 210). In other words, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and

---

[1] In *Montgomery*, the Supreme Court held that *Miller*'s prohibition against mandatory life sentences for juvenile homicide offenders was retroactive on collateral review. *Montgomery*, 577 U.S. at 208-09, 212.

constitutionally sufficient" to ensure the "individualized consideration of youth." *Jones*, 141 S. Ct. at 1313, 1320.

The Oregon Supreme Court denied Kinkel's claim on the merits, finding that he fell "within the narrow class of juveniles who, as *Miller* recognized, may be sentenced to life without the possibility of parole." *Kinkel v. Persson*, 363 Or. at 4, 27-38. The Oregon Supreme Court first remarked that *Miller* did not consider "how the categorical limitations [] it announced for a single sentence for one conviction would apply to an aggregate sentence for multiple convictions." *Id.* at 20.[2] It also observed that "[i]t might be possible to uphold [Kinkel's] sentence against an Eighth Amendment challenge based solely on the number and magnitude of his crimes." *Id.* at 24. The Oregon Supreme Court relied, instead, on the sentencing court's findings, made after "a six-day sentencing hearing at which it considered all the evidence that [Kinkel] presented regarding his youth, his psychological problems, and positive aspects of its character." *Id.* at 27.

In particular, the Oregon Supreme Court noted:

> The trial court accepted, as petitioner's medical experts had testified, that petitioner suffered from a schizoaffective disorder that motivated him to commit his crimes, and the court agreed that petitioner's disorder was not a function of his youth – *i.e.*, his condition could be treated but never cured. The sentencing court agreed that, if petitioner's disorder were untreated or inadequately treated, petitioner "remained dangerous." Specifically, the sentencing court agreed with petitioner's expert that "there is no cure for [petitioner's] condition, that he should never be released without appropriate medication and – I quote – 'an awful lot of structure and appropriate support services arranged for him.'"

*Id.* at 27-28. The Oregon Supreme Court deemed these findings "inconsistent" with the notion that Kinkel's offenses arose from "the transient immaturity of youth" and instead found that they

---

[2] In *Jackson v. State*, 359 Ark. 87 (2004), the defendant Kuntrell Jackson had been convicted of capital felony murder committed when he was 14 years old and his co-defendant had shot and killed a store clerk during a robbery. *Miller*, 567 U.S. at 465-66. In *E.M.J. v. State*, 928 So.2d 1077 (Ala. Crim. App. 2004), the defendant Evan Miller was convicted of murder in the course of arson committed when he was also 14. *Miller*, 567 U.S. at 469.

evinced an "irretrievably depraved character" arising from "a deep-seated psychological problem that will not diminish as [Kinkel] matures." *Id.* at 27-28 (citations omitted). In light of the sentencing court's findings and the severity of Kinkel's crimes, the Oregon Supreme Court could not "say that [Kinkel]'s sentence is constitutionally disproportionate to his crimes for the reasons that underlie the Court's decisions in *Miller* and *Graham*." *Id.* at 30.

Kinkel contends that the Oregon Supreme Court's decision rests on an unreasonable application of *Miller*, because the sentencing court could not have followed the "procedural and substantive standard created by *Miller*" when it imposed sentence more than twelve years before *Miller* was issued. Pet'r Brief at 56-57. Kinkel emphasizes that the record "is void of any indication" that his youth was considered in accordance with *Miller*, Pet'r Brief at 44, and the sentencing court's rejection of his Eighth Amendment arguments shows that it failed to "evaluate his youth as a heavily weighted mitigating factor." Pet'r Sur-Reply at 7 (ECF No. 147). Kinkel thus argues that his sentencing did not comply with "the minimum threshold requirement" of *Miller* – "that a juvenile have the meaningful opportunity to present and have considered their youth and attendant characteristics." *Id.* Kinkel maintains that "no court has ever appropriately considered" his youth, and he is entitled to a resentencing hearing where a court considers evidence of his youth and related characteristics and determines whether his "profound capacity for change counsels against a life without parole sentence." *Id.* at 6-7; Pet'r Brief at 46, 51.[3]

_____

[3] Kinkel also makes the extraordinary request that this Court grant habeas relief and conduct a "*Miller* hearing" to review evidence of his "rehabilitation and maturity" and determine whether he is "irreparably corrupt under the *Miller* standard." Pet'r Brief at 50-51. The extent of this Court's authority under § 2254(d) is to determine whether the Oregon Supreme Court's decision was contrary to or an unreasonable application of *Miller*. If this Court so found, the appropriate remedy would be an order vacating Kinkel's sentence and remanding the case to the state court for resentencing or other proceedings consistent with *Miller*.

Relatedly, Kinkel moves to expand the record and add the following new evidence: 1) a forensic psychologist's report with "information regarding the current research associated with the

The fact that Kinkel was sentenced before *Miller* was decided does not necessarily mean that his sentencing hearing did not comply with its requirements. At its core, *Miller* requires "'only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing' a life-without-parole sentence." *Jones*, 141 S. Ct. at 1314 (quoting *Miller*, 567 U.S. at 483); *see also Montgomery*, 577 U.S. at 209-10; *Miller*, 567 U.S. at 470, 476, 479-80. Although *Montgomery* supported the underlying premise of Kinkel's argument – that *Miller* requires a finding of "irreparable corruption" rather than "transient immaturity" before a juvenile murderer may be sentenced to life without parole – *Jones* disavowed it. 141 S. Ct. at 1315-16, 1319-20. After *Jones*, a sentencer may impose a life-without-parole sentence on a juvenile who committed homicide without violating *Miller* or the Eighth Amendment, "but only if the sentence is not mandatory" and "the sentencer has discretion to consider the 'mitigating qualities of youth' and impose a lesser punishment." *Id.* at 1311, 1314; *see also id.* at 1322 (finding that "resentencing in Jones's case complied with" the Eighth Amendment "because the sentence

---

etiology of schizophrenia related to brain maturation [and] prognosis of schizophrenia," and "research related to the course of symptoms over time in relation to an individual's age"; and 2) a forensic psychologist's report and opinion that Kinkel "is a low risk for future violence in prison or the community, his mental health symptoms are in remission, he's matured and rehabilitated himself." Pet'r Mem. in Support of Mot. to Expand at 2-3 (ECF No. 129). Kinkel argues that he would have presented this evidence to the PCR court in support of his *Miller* claim had he been given the opportunity.

Federal review of state court decisions under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. The Oregon Supreme Court adjudicated Kinkel's *Miller* claim on the merits, and the expert reports Kinkel now presents were not part of the PCR record. Thus, *Pinholster* forbids federal review of the new evidence unless this Court finds that the Oregon Supreme Court unreasonably applied *Miller*. For the reasons explained, I find that it did not. Kinkel nonetheless argues that *Pinholster* does not prevent federal review of the new evidence as it relates to Grounds Six and Seven, because the Oregon courts did not adjudicate those grounds on the merits. I disagree. Kinkel's new evidence relates to his mental illness and his capacity for rehabilitation. It has no bearing on the merits of Grounds Six or Seven, i.e., whether the Oregon Supreme Court denied Kinkel an opportunity to be heard or whether it unconstitutionally excluded mentally ill juveniles from *Miller*'s orbit. *See* First Am. Pet. at 25-27. The motion is denied.

was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth").[4]

As recognized by the Oregon Supreme Court, the record here shows that the sentencing court was presented with argument and evidence regarding Kinkel's youth and its "attendant characteristics," and the sentencing court had discretion to consider that evidence and impose a sentence lesser than the equivalent of life without parole. *See Kinkel v. Persson*, 363 Or. at 27 (noting that the sentencing court considered Kinkel's "youth, his psychological problems, and positive aspects of its character").

---

[4] Members of the Supreme Court recognized that its holding in *Jones* is at odds with its language in *Montgomery*. *See Montgomery*, 577 U.S. at 208 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'"); *see also Jones*, 141 S. Ct. at 1325-27 (Thomas, J., concurring) (asserting that the *Montgomery* decision was internally inconsistent and the majority's decision in *Jones* "[o]verrule[d] *Montgomery* in substance but not in name"); *id.* at 1330-32 (Sotomayor, J., dissenting) (describing the ways in which the majority's decision in *Jones* mischaracterizes and is inconsistent with *Miller* and *Montgomery*); *Tatum v. Arizona,* 137 S. Ct. 11, 13 (2016) (Sotomayor, J., concurring) (declaring that "the Eighth Amendment requires more than mere consideration of a juvenile offender's age" and "requires that a sentencer decide whether the juvenile offender before it is a child 'whose crimes reflect transient immaturity' or is one of 'those rare children whose crimes reflect irreparable corruption'"). Nonetheless, *Jones* is the Supreme Court's last word on *Miller*, and its holding is binding on this Court.

I note, however, that *Jones*' interpretation of *Miller* and the Eighth Amendment set a federal floor for state sentencing schemes. There are ample reasons why sentencing courts may and should do more than the bare minimum required under *Jones*. Experienced sentencing judges understand that sentencings are dynamic proceedings that serve many, varied purposes, including providing victims with an opportunity for closure, defendants with motivation for self-improvement, and both the public and all those involved in the proceeding with a sense of justice, fairness, and accountability. Achieving these purposes requires significant transparency – a thorough, reasoned explanation of the process, factors considered, option available, and ultimate decision, all tailored to promote participants' and the public's understanding. This is particularly important when a life-without-parole sentence or its functional equivalent is on the table for a juvenile offender. *See* Br. for Madge Jones et al. as Amici Curiae in Supp. of Pet'r, *Jones v. Mississippi*, 141 S. Ct. 1307 (2020) (No. 18-1259), 2020 WL 3316343.

At sentencing, Drs. Bolstad and Sack explained how Kinkel's youth and immaturity impacted his mental illness and prevented him from disclosing his symptoms or seeking treatment for them. Tr. Vol. III at 383-84, 389-90, 395, 414-16; Tr. Vol. V at 676-77, 688. They also testified that it was difficult to accurately diagnose Kinkel's mental illness due to his "young" age and the fact that "[a]dolescents' symptoms change as they develop and get older." Tr. Vol. III at 355, 413; *see also* Tr. Vol. V at 677 (Dr. Sack testifying, "Fifteen- and sixteen-year-olds are in the process of – they're in a developmental process, and they are an emerging adult, and so symptom pictures can change."). Both experts found "positive" and "hopeful" prospects for the treatment and management of Kinkel's illness, particularly because he began medication at an early age. Tr. Vol. III at 448-50; Tr. Vol. V at 686-87, 690. Other witnesses, including Kinkel's sister, teachers, friends, and neighbors, testified about his childhood, upbringing, and education, and the fact of Kinkel's youth was an unavoidable and central focus of their testimony. *See* Tr. Vol. III at 270-340; Tr. Vol. IV at 496-520, 628-655; Tr. Vol. V at 732-50.

Finally, during closing argument, Kinkel's counsel stressed that "the diminished mental capacity and the youth of this defendant are significant mitigating factors" the court "must consider. " Tr. Vol. VII at 1002. Counsel argued:

> We're seeking to have you understand his conduct and to apply that understanding to your discretion in this case, based on his youthfulness and his mental disease and his neurologic dysfunction.
>
> ***
>
> [A]lthough the law requires that he be held accountable for his criminal conduct, the court cannot discount his youth in measuring its decision on sentencing. There are many reasons why the consequences for a fifteen-year-old should not be the same as an adult who committed several criminal acts.
>
> ***

We must judge the constitutionality of the sentence by looking at the age of the offender and his mental status at the time of the offense. The law presumes a fifteen-year-old to be of insufficient judgment as a matter of law to engage in virtually all of the conduct to which we attach adult standards. He's not mature enough to vote. He's not mature enough to serve on juries. He's not mature enough to drive a car. He's not mature to drink, gamble, to get married, to enter into contracts, to engage in military service.

\*\*\*

The court [m]ust consider Kip's lack of judgment due to his youthfulness in measuring its discretion in sentencing in this case, and I would read you a short quote from the U.S Supreme Court in Eddings v. Oklahoma where Justice Powell wrote:

> "Adolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, less self-disciplined than adults. crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime, as such, is not exclusively the offender's fault. Offenses by the young also represent a failure of the family, school, and the social system, which share responsibility for the development of American youth."

\*\*\*

In a civilized society, we cannot lock up our mentally ill, neurologically impaired fifteen-year-old offenders and throw away the key without a hope for the future. It's the wrong result for this young man. It's the wrong result for this community.

Tr. Vol. VII at 979-80, 1012, 1014-15, 1018.

In sum, Kinkel presented evidence and argument highlighting his youthful immaturity, his potential for rehabilitation through medication and treatment, and his diminished culpability arising from his age and mental illness. The sentencing court had discretion to consider evidence of Kinkel's "age and the wealth of characteristics and circumstances attendant to it" and impose a lesser sentence. *Miller*, 567 U.S. at 476. According to *Jones*, *Miller* requires nothing more.

Accordingly, the Oregon Supreme Court's decision that Kinkel's aggregate, 112-year sentence does not run afoul of *Miller* or violate the Eighth Amendment was not unreasonable, and habeas relief is denied on Ground Four.[5]

E.   Ground Five:  Unconstitutional Sentence in Violation of *Graham*

In Ground Five, Kinkel argues that the aggregate 87-year sentence for his Attempted Murder convictions violates the Eighth Amendment's prohibition against "the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham*, 560 U.S. at 82. Kinkel asserts that his Attempted Murder convictions qualify as non-homicide crimes under *Graham* and the consecutive sentences for those convictions constitute an impermissible sentence of life without the possibility of release.

Kinkel challenged his sentence under *Graham* in his second PCR proceeding. Resp't Exs. 209, 214, 220, 222. The Oregon Supreme Court rejected his claim, finding that "that the nature and number" of his crimes "distinguish his aggregate sentence from the aggregate sentences that other courts have found inconsistent with *Miller* and *Graham*." *Kinkel v. Persson*, 363 Or. at 22.

> For instance, this is not a case in which petitioner's aggregate life sentence resulted from a single homicide and a subsidiary related offense, such as committing murder and possessing the weapon used to commit the murder. Nor is it a case in which petitioner's aggregate life sentence resulted solely from nonhomicide offenses. Rather, this is a case in which petitioner's aggregate sentence resulted from four murders and 26 attempted murders, all of which were intentional and each of which inflicted substantial, separate harms on multiple victims.

*Id.* at 22-23 (citations omitted). I find that the Oregon Supreme Court's decision was not an unreasonable application of *Graham*.

---

[5] Kinkel also argues that the Oregon Supreme Court unreasonably determined that the sentencing court found his mental illness was not a function of his youth, could not be cured, and would not diminish as he matured into adulthood. *See Kinkel v. Persson*, 363 Or. at 27-28; Pet'r Brief at 60. Given the Supreme Court's holding in *Jones*, this argument is moot.

Granted, several courts have held that the categorical prohibition in *Graham* applies to aggregate sentences extending beyond the natural life of a juvenile who commits multiple non-homicide crimes. *Moore v. Biter*, 725 F.3d 1184, 1191 (9th Cir. 2013) (holding that a "term-of-years sentence for multiple crimes" is "materially indistinguishable from a life sentence without parole" when the petitioner will not be eligible for release within his or her lifetime); *see also Rainer v. Hansen*, 952 F.3d 1203, 1205-06 (10th Cir. 2020) (holding that *Graham* applied to a 112-year aggregate sentence imposed on a juvenile convicted of attempted murder, assault, burglary, and aggravated robbery); *White v. Premo*, 365 Or. 1, 12-13 (2019) (finding that the concerns underlying *Miller* and *Graham* apply to a term-of-years sentence "that is the functional equivalent of life"). Even if *Graham* applies to aggregate sentences similar to Kinkel's, it is not clearly established that Kinkel's Attempted Murder convictions qualify as non-homicide offenses for which a juvenile offender may not be sentenced to life without parole.

In *Graham*, the Supreme Court declared that "[j]uvenile offenders who committed *both homicide and nonhomicide* crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide." *Graham*, 560 U.S. at 63 (emphasis added). The Supreme Court further "recognized that defendants *who do not kill, intend to kill, or foresee that life will be taken* are categorically less deserving of the most serious forms of punishment than are murderers," and thus, "when compared to an adult murderer, a juvenile offender *who did not kill or intend to kill* has a twice diminished moral culpability." *Id.* at 69 (emphasis added). For that reason, sentences of life without the possibility of release are excessive and disproportionate when imposed on juveniles convicted of non-homicide crimes. *Id.* at 74.

Here, Kinkel's sentence arose from both homicide and non-homicide offenses; Kinkel killed his parents and two high school students and he admittedly intended to kill many more.

Further, Kinkel's murder of two students and attempted murder of twenty-five more occurred during the same course of conduct – the mass shooting at his high school. Given the Supreme Court's distinction between juveniles who do "not kill or intend to kill" and those who do, it is not clearly established that *Graham* prohibits the aggregate 87-year sentence Kinkel received for his twenty-six Attempted Murder convictions. *But see Rainer*, 952 F.3d at 1206 (finding that attempted first-degree murder qualified as a non-homicide offense under *Graham*). Accordingly, habeas relief is denied on Ground Five.

      F.   <u>Ground Six:  Denial of Due Process During PCR Appeal</u>

In Ground Six, Kinkel argues that the Oregon Supreme Court violated his procedural due process rights by unexpectedly ruling on the merits of his *Miller* and *Graham* claims without allowing him a meaningful opportunity to be heard. First Am. Pet. at 25-26; *see Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'").

In Kinkel's second PCR proceeding, the Oregon Court of Appeals affirmed the denial of his *Miller* claim on procedural grounds, and Kinkel maintains that the Oregon Supreme Court gave no indication it would rule on the merits when it granted review. Kinkel thus argues that the Oregon Supreme Court's unanticipated review of the merits denied him a "meaningful opportunity to offer evidence and provide argument about whether he is in fact one of the rare child offenders" who may be sentenced to life without the possibility of release. First Am. Pet. at 25. Respondent contends that Ground Six is procedurally defaulted, does not state a viable claim, and fails on the merits.

I agree that Ground Six fails to state a cognizable habeas claim under § 2254. Even if Kinkel could establish a protected liberty interest arising from his PCR proceeding, the habeas relief he seeks – resentencing or release – would not be the appropriate remedy for any deprivation of that interest. Pet'r Brief at 73 (requesting "habeas corpus relief in the same manner requested under Ground Four"); *see also id.* at 46, 51. Kinkel's imprisonment does not arise from the Oregon Supreme Court's decision in *Kinkel v. Persson* or any lack of due process during his PCR appeal, and success on this claim would not establish the unconstitutionality of his convictions or sentence. *See* 28 U.S.C. § 2254(a) (providing that a habeas claim may be brought "only" on grounds that the petitioner "is in custody in violation of the Constitution"). At most, Ground Six would entitle Kinkel to a rehearing before the Oregon Supreme Court to argue the merits of his *Miller* and *Graham* PCR claims. Kinkel does not seek such relief.

Moreover, the PCR process provided Kinkel with a meaningful opportunity to raise and argue his *Miller* and *Graham* claims. Kinkel discussed the merits of his claims in his PCR Petition and supporting memorandum, his Summary Judgment Memorandum, his brief on direct appeal before the Oregon Court of Appeals, and his Petition for Review and Brief on the Merits before the Oregon Supreme Court. Resp't Exs. 202-03, 209, 214, 220, 222, 224. Accordingly, habeas relief is denied on Ground Six.

G. Ground Seven:  Unconstitutional Sentence Based on Mental Illness

Finally, in Ground Seven, Kinkel claims that his sentence violates the Eighth Amendment because, as determined by the Oregon Supreme Court, it was based on his treatable mental illness. *See* First Am. Pet. at 27 (alleging that the "Eighth Amendment bars sentencing a child to even virtual or de facto life without parole based on a treatable mental illness that does not preclude growth, maturity, and rehabilitation"). Kinkel argues that the Oregon Supreme Court decision was

an unreasonable application of *Miller*, because it considered Kinkel's treatable mental illness as an aggravating factor that "disqualified him from *Miller*'s protective framework" and impermissibly used "a child's treatable but incurable mental illness as a proxy for a finding of permanent incorrigibility to justify a life without parole sentence." Pet'r Brief at 78; *see* Pet'r Sur-Reply at 9 (arguing that the Oregon Supreme Court rejected Kinkel's *Miller* claim on the merits "based on the fact he was a mentally ill youth and therefore categorically different" from other juveniles).

Kinkel did not present Ground Seven on direct appeal or during either PCR proceeding, and for that reason, respondent argues that this claim is unexhausted and barred from federal review. 28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Ground Seven fails on the merits and I need not decide whether it is procedurally barred. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

First, the Oregon Supreme Court did not find Kinkel's youth irrelevant or *Miller* inapplicable because he was mentally ill at the time of his offenses. Rather, the Oregon Supreme Court found that the nature of Kinkel's mental illness distinguished his case from *Miller* and, notwithstanding his youth, *other* factors – including the severity of the crimes, the number of victims, the degree of harm, and Kinkel's potential future dangerousness – left him "within the narrow class of juveniles" who may be sentenced to life without the possibility of parole. *Kinkel v. Persson*, 363 Or. at 20-21, 27-28; *see id.* at 21 ("Given the nature and the number of the crimes that petitioner committed, we are hard pressed to say that his aggregate sentence is constitutionally disproportionate even taking his youth into account."); *White*, 365 Or. at 18 (distinguishing the petitioner from Kinkel because Kinkel's offenses arose from "a deep-seated psychological

problem that will not diminish" and were so "heinous" that "no reasonable person could dispute that they reflected…an 'irretrievably depraved character'").

The Oregon Supreme Court recognized that Kinkel's "fixed psychological problems" were "relevant mitigating evidence" of "diminished moral culpability," but because his mental illness "diminish[ed] his culpability for reasons that [were] unrelated to his youth," it was "not the sort of concerns that led to the categorical sentencing limitations announced in *Roper*, *Miller*, and *Graham*." *Kinkel v. Persson*, 363 Or. at 29. In other words, the Oregon Supreme Court found that Kinkel's mental illness did not signify "transient immaturity" or other youthful characteristics that *Miller* found to counsel against a sentence of life without parole. *Id.* at 28; *see also White*, 365 Or. at 18. No language in *Kinkel v. Persson* implies that *Miller*'s prohibition against mandatory life-without-parole sentences is inapplicable to juveniles who commit homicide because of mental illness.

Second, *Miller* did not address the issue of mental illness or preclude it as a sentencing factor when a juvenile offender is convicted of homicide; *Miller* requires only that a sentencer have discretion to consider the offender's youth and pertinent characteristics before imposing sentence. Kinkel cites no controlling precedent that prohibits a sentencer from considering a juvenile offender's mental illness and its impact on that offender's future dangerousness when determining the appropriate sentence. Accordingly, Kinkel's mental illness was not an impermissible sentencing factor under *Miller*, and habeas relief is denied on Ground Seven.

<u>CONCLUSION</u>

The tragedy of this case cannot be overstated. Four people, including two teenagers, senselessly lost their lives, dozens of high school students were seriously wounded, and the physical and emotional scars from the ill-fated days in May 1998 undoubtedly live on for the

victims and their families. And yet, the perpetrator of these offenses, horrible as they were, was a child suffering from a severe mental illness – a child who would remain dangerous into adulthood if his mental illness was not appropriately treated. The sentencing judge faced a daunting task in weighing these factors and fashioning a proportional sentence.

On federal habeas review, the question is not whether this Court agrees with the nearly 112-year sentence Kinkel received for his crimes, or whether this Court believes his youth and mental illness should have weighed in favor of a lesser sentence allowing for the possibility of release. The sole question before this Court is whether the Oregon courts reasonably found that Kinkel's plea and sentencing proceedings complied with federal constitutional requirements, particularly those set forth in *Miller* and *Graham*. For the reasons explained above, they did.

The First Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (ECF No. 90) is DENIED, and the Motion to Expand Record (ECF No. 129) is DENIED. A Certificate of Appealability is GRANTED with respect to Grounds Three, Four, and Five. A Certificate of Appealability is DENIED with respect to Grounds One, Two, Six, and Seven, as Kinkel has not made a substantial showing of the denial of a constitutional right as to those grounds. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this  6th  day of January, 2022.


_____/s/Ann Aiken_____
Ann Aiken
United States District Judge